<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

BANK UNITED, NA,

      Plaintiff,

      v.

GC OF VINELAND, LLC, WILLIAM
SCISM and KAREN SCISM,

      Defendants,

AND

GC OF VINELAND, LLC, WILLIAM
SCISM and KAREN SCISM,

      Third-Party Plaintiffs,

      v.

GOLDEN CORRAL CORPORATION,
GOLDEN CORRAL FRANCHISING
SYSTEMS, INC. and FIRST CHATHAM
BANK,

      Third-Party Defendants.

---

No. 18cv12879 (EP) (CLW)

**OPINION**

---

**PADIN, District Judge.**

    This case involves the breakdown of a franchise relationship between Third-Party Plaintiffs William and Karen Scism ("Mr. Scism and Mrs. Scism," respectively, or collectively, the "Scisms") and GC of Vineland, LLC ("GCV") (collectively, the "Scism Parties") and Third-Party Defendants Golden Corral Corporation and Golden Corral Franchising Systems, Inc. (collectively, "Golden Corral").  Golden Corral and the Scism Parties move for summary judgment as to the Scism Parties' third-party claims and Golden Corral's counterclaim.  *See* D.E.s 129, 130.  The

Court decides the motions on the papers.  *See* Fed. R. Civ. P. 78(b); L.Civ.R. 78(b).  For the reasons below, the Court will **GRANT** Golden Corral's motion, **DISMISS** the Scism Parties' Complaint **with prejudice**, and **ENTER JUDGMENT** on Golden Corral's counterclaim against the Scism Parties in the amount of $1,168,368.  The Court will therefore **DENY** the Scism Parties' cross motion, D.E. 130-3.

## I.   BACKGROUND[1] [2]

### A.  Factual Background[3]

The Scisms entered into a franchise agreement, D.E. 129-2, Ex. A ("Agreement"), with Golden Corral on May 24, 2007, with the Scisms as franchisees and Golden Corral as franchisor, for a Golden Corral restaurant at 3624 S. Delsea Drive, Vineland, New Jersey ("Restaurant").  Golden Corral SOF ¶¶ 1, 7; Scism Reply to SOF ¶¶ 1, 7.  On April 20, 2011, the Scisms assigned the Agreement to GCV.  Golden Corral SOF ¶ 2; Scism Resp. to SOF ¶ 2.  The Restaurant opened on or about October 19, 2011, and the franchise was to run until or about October 31, 2026 (approximately a fifteen-year term).  Golden Corral SOF ¶¶ 7, 8; Scism Resp. to SOF ¶¶ 7, 8.

On or about May 22, 2018, the Scism Parties ceased operations of the Restaurant.  Golden Corral SOF ¶¶ 12-13; Scism Resp. to SOF ¶¶ 12-13.  The Scism Parties' actions constituted default, and Golden Corral terminated the Agreement on June 18, 2018.  Scism SOF ¶ 85 (citing D.E. 59-4 ("Termination Letter")); Golden Corral Resp. to SOF ¶ 85.

---

[1] This section derives mainly from the parties' statements of facts.  *See* D.E.s 129-3 ("Golden Corral SOF"), 130-1 ¶¶ 1-56 ("Scism Resp. to SOF"), 130-1 ¶¶ 57-86 ("Scism SOF"), 132 ("Golden Corral Resp. to SOF"), 133-2 ("Scism Supp. SOF").

[2] For simplicity, the Court omits a discussion of the factual and procedural history of this case involving parties and claims not pertinent to the resolution of these motions.  Some of that history can be found in Judge Esther Salas' opinion granting in part and denying in part Golden Corral's motion to dismiss.  *See generally Scism v. Golden Corral Corp.*, 2019 WL 6522738 (D.N.J. Dec. 4, 2019); D.E. 35.

[3] The facts in this section are undisputed.

Pursuant to Section IV.A.2 of the Agreement, the Scism Parties agreed to pay Golden Corral a royalty fee equal to 4% of the Restaurant's gross sales. Golden Corral SOF ¶ 15; Scism Resp. to SOF ¶ 15. Additionally, pursuant to Section IV.B of the Agreement, the Scism Parties agreed to pay Golden Corral a marketing fee, as a percentage of gross sales. Golden Corral SOF ¶ 16; Scism Resp. to SOF ¶ 16. However, following the Restaurant's closing, the Scism Parties stopped paying Golden Corral. Golden Corral SOF ¶ 17; Scism Resp. to SOF ¶ 17.

### B. Procedural Background

The Scism Parties filed a third-party complaint on December 12, 2018, bringing twelve claims against Golden Corral. D.E. 20 ("TPC" or "Third-Party Complaint"). After the Court[4] granted in part and denied in part Golden Corral's motion to dismiss, D.E.s 22, 35-36, the Scism Parties' remaining claims are (1) breach of contract, which alleges Golden Corral breached multiple provisions of the Agreement (Count Nine), and (2) violation of the New Jersey Franchise Practice Act ("NJFPA"), alleging Golden Corral imposed unreasonable standards of performance on the Scism Parties during the course of their franchisee-franchisor relationship (Count Ten). TPC ¶¶ 109-118. Golden Corral answered and asserted a singular counterclaim of breach of contract, which alleges the Scism Parties breached the Agreement by ceasing Restaurant operations and have failed to pay Golden Corral consequential damages pursuant to the Agreement. D.E. 59-1 ("GCC" or "Golden Corral Complaint") ¶¶ 23-26.

Golden Corral moves for summary judgment in its favor as to the Scism Parties' claims and Golden Corral's counterclaim. D.E. 129-1 ("Golden Corral Mot."). The Scism Parties oppose Golden Corral's Motion and cross move for summary judgment in its favor as to the same claims and counterclaim. D.E. 130-3 ("Scism Opp'n"). Golden Corral opposes the Scism Parties' Cross

---

[4] Judge Salas.

Motion and replies.  D.E. 131 ("Golden Corral Reply").  The Scism Parties reply.  D.E. 133 ("Scism Reply").

## II.   LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over nonmaterial facts will not preclude a court from granting summary judgment.  *See id.*

The moving party has the initial burden of showing the basis for its motion and demonstrating that there is an absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party must support its motion by citing to specific materials in the record.  Fed. R. Civ. P. 56(c)(1)(A).

If a moving party adequately supports its motion, then the burden shifts to the nonmoving party to "go beyond the pleadings" and designate specific facts on the record that demonstrate a genuine dispute for trial exists.  *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted).  Specifically, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party.  *Anderson*, 477 U.S. at 250.  If the nonmoving party fails to provide such evidence, or where the "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment."  *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).  However, "[i]f reasonable minds

could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250-51.

In reviewing a motion for summary judgment, a court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marina v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). But if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 322.

## III.    ANALYSIS

### A.  Golden Corral Did Not Breach the Agreement

"[T]o succeed on a breach of contract claim . . . , a plaintiff must show . . . (1) a valid contract existed, (2) . . . the defendant failed to perform under the contract, and (3) that failure to perform caused injury to plaintiff." *Webster v. Dollar General, Inc.*, 197 F. Supp. 3d 692, 704 (D.N.J. 2016). Courts "can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted is subject to only one reasonable interpretation." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 163-64 (3d Cir. 2001).

The Scism Parties allege that Golden Corral breached the Agreement by violating assistance and training, freedom to set prices, and Restaurant inspections provisions (Count Nine). Specifically, the Scisms Parties allege Golden Corral violated the following provisions:

- The "Whereas Clause"--WHEREAS Franchisee desires to enter into the business of operating at GC-11M "Golden Corral" restaurant under the Proprietary Marks and the System (hereinafter referred to as "restaurant" or "franchised business") and wishes to obtain a franchise from Franchisor for that

purpose**, as well as to receive the training and other assistance** provided by Franchisor in connection therewith . . . .

- **The "On-Site Assistance Clause"--**Upon Franchisee's request, and subject (as to timing) to the availability of personnel**, Franchisor shall provide Franchisee, at Franchisor's expense, an aggregate of fifteen (15) to forty-five (45) man-days of on-site management assistance in connection with the opening of the restaurant**.

- **The "Continuing Advisory Assistance Clause"--Franchisor shall provide to Franchisee periodic and continuing advisory assistance to Franchisee** in the operation and promotion of the franchised business, and advice and written materials concerning new developments in Franchisor's restaurant, equipment, food products, packaging, and preparation.

- **The "Menu Pricing Clause"--**With respect to the offer and sale of all menu items, products, and services, **Franchisee is free to set prices PROVIDED that the Franchisor may, where allowed by applicable law, establish maximum prices** which may be charged based on an analysis of the market and to facilitate advertising and competitive strategies.

- **The "Inspections Clause"--Franchisee shall grant Franchisor**, its agents and its representatives, **the right to enter upon the restaurant premises at any reasonable time for the purpose of conducting inspections**; cooperate with Franchisor's representatives in such inspections . . . .

Golden Corral Mot. at 8-9 (cleaned up) (emphasis added); *see also* Golden Corral SOF ¶¶ 20-24;

Scism Resp. to SOF ¶¶ 20-24; TPC ¶¶ 109-112.

Golden Corral argues they did not violate any of these provisions. *See* Golden Corral Mot.

at 9. The Scism Parties disagree. Scism Opp'n at 24-26.[5] The Court agrees with Golden Corral.

---

[5] This branch of the Scism Parties' Opposition/Cross Motion contains only one citation to the record, which establishes that Golden Corral required the Restaurant's Saturday lunch prices must be less expensive than Saturday dinner prices. *See id.* at 24 n.16.

*1.  Golden Corral did not violate the Whereas Clause*

The Scism Parties allege that Golden Corral violated the Whereas Clause by failing to provide "training and assistance" to the Scism Parties.  TPC ¶ 111.

Golden Corral argues that "insofar as the Scism Parties' contract claim is premised upon the Whereas Clause on the first page of the . . . Agreement, such clause is a general reference . . . and does not independently set forth any rights or obligations of the parties."  Golden Corral Mot. at 10 (cleaned up).  Rather, the specific clauses that follow the Whereas Clause govern the Agreement.  *Id.* (citing *Gil v. Clara Maass Med. Ctr.*, 450 N.J. Super. 368, 378 (Super. Ct. App. Div. 2017) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general.")).

The Scism Parties do not address this argument, and thus this branch of their breach of contract claim is abandoned.  *See generally* Scism Opp'n at 24-26; *Leone-Zwillinger v. New Jersey*, 2007 WL 1175786, at *3 (D.N.J. Apr. 19, 2007) (cleaned up) ("[W]hen a party fails to offer any argument or evidence . . . in opposition to defendants' motion for summary judgment, such claims may be deemed to have been abandoned.").

Accordingly, this branch of the Scism Parties' breach of contract claim will be dismissed.

*2.  Golden Corral did not violate the On-Site Assistance Clause*

The Scism Parties allege that Golden Corral failed to provide "an aggregate of fifteen (15) to forty-five (45) man-days of on-site management assistance in connection with the opening of the restaurant[]" in violation of the On-Site Assistance Clause.  Golden Corral SOF ¶ 21; Scism Resp. to SOF ¶ 21; *see also* TPC ¶ 11.

Golden Corral argues that this assistance was provided because two Golden Corral representatives, among other personnel, were at the Restaurant for three days prior to opening and approximately the first ten days of operation, which totals thirteen days/twenty-six man-days. Golden Corral Mot. at 10-11 (citing Golden Corral SOF ¶ 26 (citing 129-2 Ex. C ("Mr. Scism Dep."), 40:7-41:13)).

The Scism Parties do not dispute that the above was provided; rather, they argue that "man-days are not defined and no evidence relating to a purported definition has been presented by Golden Corral[]." Scism Opp'n/Cross-Mot. at 25. But it is axiomatic that courts can interpret contract language according to the "plain, common meaning of the words themselves . . . ." *Moran v. Prather*, 90 U.S. 492, 501 (1874); *see also Emerson Radio Corp.*, 253 F.3d at 163-64 (summary judgment is appropriate where contractual language "is subject to only one reasonable interpretation"). Here, "man-day" has a plain, dictionary definition: "a unit of one day's work by one person[.]"[6] Thus, there is no genuine dispute of material fact that Golden Corral complied with the On-Site Assistance Clause where two employees each worked thirteen days, totaling twenty-six man-days.

Accordingly, this branch of the Scism Parties' breach of contract claim will be dismissed.

### 3.  Golden Corral did not violate the Continuing Advisory Assistance Clause

The Scism Parties allege that Golden Corral failed to provide "periodic and continuing advisory assistance[]" in violation of the Continuing Advisory Assistance Clause. Golden Corral SOF ¶ 22; Scism Resp. to SOF ¶ 22. This assistance was to include "advice and written materials concerning new developments in Franchisor's restaurant, equipment, food products, packaging,

---

[6] *Man-day*, MERRIAM-WEBSTER.COM, https://merriam-webster.com/dictionary/man-day (last visited Mar. 19, 2024).

8

and preparation." Golden Corral Mot. at 11 (citing Golden Corral SOF ¶ 22); *see also* Scism Resp. to SOF ¶ 22.

Golden Corral argues this periodic assistance was provided because "Mr. Scism . . . received written materials concerning new developments, numbering in the hundreds, which were distributed monthly." Golden Corral Mot. at 12 (citing Golden Corral SOF ¶ 29); *see also* Scism Resp. to SOF ¶ 29. These written materials were "Hot off the Grill newsletters," which "had all of the changes that were coming up[,]" and "was where everything – you could see was going to happen." Golden Corral Mot. at 12 (citing Golden Corral SOF ¶¶ 30-31 (citing Mr. Scism Dep. 49:17-21)); *see also* Scism Resp. to SOF ¶¶ 30-31.

The Scism Parties argue that Golden Corral violated the Continuing Advisory Assistance Clause because Golden Corral did not "actually come to the store to assist" or provide meaningful or substantive assistance. Scism Opp'n at 26. The Scism Parties cite no evidence that the Agreement required Golden Corral come to the Restaurant or provide "meaningful" or "substantive" assistance. *See* Golden Corral SOF ¶¶ 21-22; Scism Resp. to SOF ¶¶ 21-22.

Additionally, the Scism Parties fail to explain why the Hot off the Grill newsletters do not satisfy the Continuing Advisory Assistance Clause, which by its plain language requires Golden Corral to provide "advice and written materials concerning *new developments* in Franchisor's restaurant, equipment, food products, packaging, and preparation." Golden Corral SOF ¶ 22 (emphasis added); Scism Resp. to SOF ¶ 22. Mr. Scism testified that the Hot off the Grill newsletters "had *all of the changes* that were coming up." Mr. Scism Dep. 49:17-21 (emphasis added).[7]

---

[7] Indeed, the Scism Parties claim these newsletters contained even further information, including "information regarding 'required' food items, 'required merchandising' that auto-ships to stores, pricing reminders, recipe news, and employee recognitions[]." Scism Resp. to SOF ¶ 30.

Without citation to any evidence in the record, the Scism Parties fail to meet their summary judgment burden.  *See United States v. Morton*, 993 F.3d 198, 205 n.10  (3d Cir. 2021) (cleaned up) ("Judges are not like pigs, hunting for truffles buried in the record.").

Accordingly, this branch of the Scism Parties' breach of contract claim will be dismissed.

### 4.  Golden Corral did not violate the Menu Pricing Clause

The Scism Parties allege that Golden Corral violated the Menu Pricing Clause, "which provides that the franchisee is free to set prices with respect to the offer and sale of menu items, products and services[,]" notwithstanding that Golden Corral "may, where permissible under applicable law, establish maximum prices based upon a market analysis and to facilitate advertising and competitive strategies."  Golden Corral Mot. at 13-14 (citing Golden Corral SOF ¶ 23); *see also* Scism Resp. to SOF ¶ 23.

Golden Corral argues that "the Scism Parties *were* free to set prices," but that the Scism Parties' claim is based on "Mr. Scism['s] belie[f that it would] be a poor business decision to set prices [that] might differ from Golden Corral's national advertising."  Golden Corral Mot. at 14 (emphasis in original) (citing Golden Corral SOF ¶ 37).

The Scism Parties argue they were not free to set prices because (1) they could not "refuse to comply with promotions that compel certain pricing"; (2) Golden Corral ran national advertisements, "which de facto controlled prices that the Scism Parties could charge"; and (3) beginning in January 2018, Mr. Scism could not charge more for lunch than dinner on Saturdays. Scism Opp'n at 24; *see also id.* at n.16 (citing Scism Resp. to SOF ¶ 37).  The Scism Parties also argue that even though the Agreement permits Golden Corral to "establish maximum prices based upon a market analysis[,]" Golden Corral has never described any price as a "maximum price" or

provided evidence that the "maximum prices" were based on any market analysis.  Scism Opp'n at 25.

The Scism Parties cite no case law to support that compliance with nationwide promotions or the existence of national advertising constitute "de facto" controlled prices.  Nor do they explain how these promotions and advertising do not fall into the Agreement's plain language permitting Golden Corral to set maximum prices to "facilitate advertising and competitive strategies."  *See* Golden Corral Reply at 12 (citing Golden Corral SOF ¶ 23).  And, as Golden Corral notes, it is not Golden Corral's burden to provide evidence that any "maximum prices" were based on market analysis; the Scism Parties must first establish a genuine dispute of material fact that the Menu Pricing Clause was breached.  *See id.* at 15 n.5; *supra* Section II.

Further, the Scism Parties do not dispute that, besides promotions and requiring lunch to be less expensive than dinner, Mr. Scism was free to set the Restaurant's prices.  *See* Golden Corral SOF ¶ 37; Scism Resp. to SOF ¶ 37 (citing Mr. Scism Dep. 50:23-2, 58:20-59:15, 126:13-130:13, 158:25-161:16, 169:2-173:12, 184:9-186:12)).  For example, the Scism Parties do not claim that Golden Corral told Mr. Scism what prices to charge for lunch on Saturdays—just that lunch needed to be less expensive than dinner.  Without any evidence or case law suggesting Golden Corral's actions constitute price fixing, the Court cannot find as a matter of law that Golden Corral breached the Menu Pricing Clause.

Accordingly, the Court will dismiss this branch of the Scism Parties' breach of contract claim.

5.  *Golden Corral did not violate the Inspections Clause*

Finally, the Scism Parties allege that Golden Corral violated the Inspections Clause because Golden Corral failed to conduct inspections "at a[] reasonable time."  Mot. at 15 (citing Golden

11

Corral SOF ¶¶ 19, 24); *see also* Scism Resp. to SOF ¶¶ 19, 24.  This claim is based on the allegation that when Golden Corral would inspect local Golden Corral restaurants, Golden Corral would frequently inspect the Scisms Parties' Restaurant first.  Mot. at 15-16 (citing Golden Coral SOF ¶ 41); *see also* Scism Resp. to SOF ¶ 41 ("[T]he Scism Parties were targeted first for inspections in the region seven times in a row; whereas others had time to prepare once word got around that the Scism Parties were inspected, [therefore] the Scism Parties never had the benefit of hearing that another restaurant was inspected first.").

Golden Corral argues the Scism Parties' claim is merely a "perceived unfairness" because there is no allegation that the specific time Golden Corral conducted inspections was "unreasonable," as prohibited by the Agreement.  Golden Corral Mot. at 16.  For example, the Scism Parties do not allege that "Golden Corral woke Mr. Scism up in the middle of the night to inspect the premises."  *Id.*

The Scism Parties do not address this argument.  *See* Scism Opp'n at 24-26.  Accordingly, this branch of the Scism Parties' breach of contract claim is deemed abandoned and will be dismissed.  *See Leone-Zwillinger*, 2007 WL 1175786, at *3.[8]

Because the Scism Parties fail to establish a genuine dispute of material fact that Golden Corral breached the Agreement, the Court will dismiss their breach of contract claim (Count Nine).[9]

---

[8] Additionally, the Inspections Clause does not require inspections in any particular order.

[9] Golden Corral argues in the alternative that if the Court finds it breached the Agreement, the Scism Parties' claim fails for lack of damages.  *See* Golden Corral Mot. at 25-27.  Because the Court finds Golden Corral did not breach the Agreement, it will not address this argument.

### B.  Golden Corral Did Not Violate the NJFPA

Under the NJFPA, franchisors cannot "impose unreasonable standards of performance upon a franchisee." N.J.S.A. § 56:10-7(e).  "The statute does not define 'unreasonable standards of performance,' . . . and the New Jersey courts have not given much guidance." *S. Gas, Inc. v. ExxonMobil Oil Corp.*, 2016 WL 816748, at *7 (D.N.J. Feb. 29, 2016) (quoting *King v. GNC Franchising, Inc.*, 2006 WL 3019551, at *4 (D.N.J. Oct. 23, 2006)).  Because the NJFPA is a remedial statute, it "must be construed broadly to give effect to [its] legislative purpose." *Id.* at *8 (quoting *Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 566 (3d Cir. 1998)).

In *King*, the Court reviewed cases where courts found "unreasonable standards of performance," and concluded that the "hallmarks" of these cases were the "arbitrariness, bad intent[,] or economic ruin" present.  2006 WL 3019551, at *5 (collecting cases).  A plaintiff cannot succeed if they put forth no evidence of arbitrariness, bad intent, or economic ruin. *See id.* (no NJFPA violation where there was a "lack of evidence in the record to support [p]laintiffs' allegations of unreasonableness[]").  When determining whether a defendant's actions were unreasonable, a court may consider the cumulative effect of multiple acts. *S. Gas, Inc.*, 2016 WL 816748, at *7 (citing cases where courts considered cumulative effect of alleged unreasonable standards).

The Scism Parties allege that Golden Corral imposed the following unreasonable standards of performance:

> (1) inspecting the Restaurant first during inspections, which allowed other franchised restaurants to be "tipped off of the inspections" and "prepare[,]" a "benefit" the Restaurant never received;
> (2) running the Restaurant's Facebook account to "post promotions, sales, and pricing information";
> (3) failing to provide sufficient assistance to run the Restaurant;

13

(4) failing to "maintain[] any practice or system in place to assist operations and help a failing franchised restaurant";

(5) controlling the Restaurant's prices by running national advertisements and requiring the Restaurant to comply with promotions, including a Veteran's Day promotion of free meals to veterans and discounted child prices;

(6) requiring the Restaurant to purchase certain equipment, such as "two additional chocolate fountains" and vegetable display baskets, the latter of which would cause vegetables to quickly spoil;

(7) sometimes shipping food to the Restaurant that "was not ordered or needed" but invoicing the Restaurant without any discount, credit, or reimbursement;

(8) not permitting the Scism Parties to obtain a liquor license; and

(9) not permitting the Scism Parties to open a drive-thru lane.

TPC ¶ 117(a)-(i).

Golden Corral argues (1) most of the above allegations are not standards of performance and (2) the allegations that are standards of performance were not unreasonable. Golden Corral Mot. at 19-24. The Scism Parties argue that when viewing the allegations cumulatively and in the context of the Restaurant's "unsuitable" location, Golden Corral's actions were unreasonable. Opp'n at 21-23. The Court agrees with Golden Corral.

*1. Most of the alleged acts are not "standards of performance"*

Golden Corral argues that "items (1)-(4) and (7)-(9)" are not "standards[] or measurements[]" that the Scism Parties were being held to by Golden Corral. Golden Corral Mot. at 19. The Scism Parties do not address this argument directly, focusing only on the unreasonableness of the alleged acts, not whether the alleged acts fall into the NJFPA's purview. *See* Scism Opp'n at 19-23. Though the Court considers this argument waived, the Court briefly addresses why it mostly agrees with Golden Corral. *See Leone-Zwillinger*, 2007 WL 1175786, at *3.

When broken down, the NJFPA prohibits (1) a franchisor (2) imposing (3) a standard of performance (4) upon the franchisee (5) that is unreasonable.  *See* N.J.S.A. § 56:10-7(e).  Simply put, the franchisor must require the franchisee to complete an action that is both measurable and unreasonable.  *See id.*  Many of the Scism Parties' allegations relate to Golden Corral's contractual obligations, not obligations imposed upon the Scism Parties, *i.e.*, inspecting the Restaurant at a reasonable time (item 1), running a social media account (item 2), and failing to provide sufficient support to run the Restaurant (item 3) or help the failing restaurant (item 4).  *See, e.g.*, *Dunkin' Donuts Inc. v. Dough Boy Mgmt., Inc.*, 2006 WL 20521, at *3 (D.N.J. Jan. 3, 2006) (distinguishing between defendant's "failure to perform its contractual obligations[,]" such as "provid[ing] support, training and consultation, [and] visit[ing] and assist[ing] shops" from "the imposition of unreasonable standards of performance to set [plaintiffs] up for failure"); *Central Jersey Freightliner, Inc. v. Freightliner Corp.*, 987 F. Supp. 289, 293 (D.N.J. 1997)  (alleged unreasonable standards of performance included "(1) requiring [plaintiffs] to remain open for business 24 hours a day, seven days a week[;] and (2) requiring [plaintiffs] to maintain specific inventory levels, sales quotas[,] and financing").  And the Court already determined Golden Corral did not breach those obligations.  *See supra* Section III(A).

Similarly, Golden Corral not permitting a liquor license or drive-thru are not standards of performance imposed upon the Scism Parties.  And, as Golden Corral argues, to the extent the Scism Parties argue that they were being unreasonably required to run the franchise without a liquor license (item 8) or a drive-thru (item 9), conditions they agreed to initially, this argues for a "reverse standard" that is "without merit or any factual support."  Golden Corral Mot. at 20 n.2.  The Scism Parties cite no case law to support that not receiving permission to act is the equivalent of being required to act.  This would flip the NJFPA on its head.  *See id.* (What the Scism Parties

propose is "the equivalent of a franchisee suing McDonald's because the franchisee was still being required to sell hamburgers and fries.").

But the Court disagrees with Golden Corral that item (7)—requiring the Scism Parties to pay for food they did not request—is not a standard of performance, as it is similar to requiring the Scism Parties to purchase Restaurant equipment, which Golden Corral concedes is a standard of performance. *See* Golden Corral Mot. at 20-21. Thus, for completeness, the Court will consider whether under the facts of this case, items (5), (6), and (7) were "unreasonable."

   *2.  Items (5), (6), and (7) were not unreasonable standards of performance*

The Scism Parties' remaining allegations are that requiring the franchise to run promotions of free meals to veterans on Veterans Day and discounted prices for children (item 5); purchase certain business equipment, including two chocolate fountains and vegetable baskets (item 6); and pay for unsolicited food shipments (item 7) were unreasonable standards of performance. Golden Corral argues that none of its actions were unreasonable because the Scism Parties cannot show the actions were arbitrary, done with bad intent, or caused economic ruin. Golden Corral Mot. at 20-24; *see also King*, 2006 WL 3019551, at *5 (establishing the "hallmarks" of unreasonable standards). The Scism Parties respond that "[w]ith the factual context of a remarkably unsuitable and unsustainable location[,] . . . [these] actions taken by Golden Corral have the cumulative effect of being unreasonable[,]" even if each isolated action was not unreasonable "in and of itself." Scism Opp'n at 22, 23. The Court agrees with Golden Corral.

First, the Scism Parties argue running promotions and buying chocolate fountains and vegetable baskets were unreasonable because they were implementations of unproven market strategies, citing *Beilowitz v. General Motors Corp.*, 233 F. Supp. 2d 631, 643-44 (D.N.J. 2002), in support. *See id.* at 20, 22. But in *Beilowitz*, on a motion for a preliminary injunction, the court

16

found that plaintiff franchisee was reasonably likely to succeed on his NJFPA claim because "requir[ing] a franchisee to operate at a substantial financial loss while the franchisor attempts to implement a new and unproven marketing strategy" was an "unreasonable standard of performance." 233 F. Supp. 2d at 644. This "substantial loss" was "$11 million in sales[,] . . . which constitute[d] approximately forty percent of [plaintiff's] overall sales." *Id.* at 643-44.

The Scism Parties offer no evidence of any similar substantial loss. As for running promotions, the Scism Parties allegations boil down to (1) the fact that a customer pays less money when a meal is free or discounted, and (2) Golden Corral did not reimburse the Scism Parties for their compliance with the promotions. *See* Scism Opp'n at 22. But the Scism Parties do not explain why these promotions were arbitrary or done with bad intent, nor do they demonstrate how the promotions caused the Restaurant to operate at a loss, let alone a substantial loss.[10]

As for buying chocolate fountains and vegetable baskets, the Scism Parties do not dispute that these items cost approximately $4000-$5000. *See* Golden Corral SOF ¶ 45 (quoting Mr. Scism Dep. 188:14-16, 190:1-3) (The complained-of items of equipment were (1) "two additional chocolate fountains, which Mr. Scism estimated to cost between $1,000 and $2,000 apiece;" and (2) "in 2016[,] certain vegetable baskets totaling 'a couple thousand.'"); Scism Resp. to SOF ¶ 45 (admitted). Again, the Scism Parties do not explain how Golden Corral requiring these purchases was arbitrary, done in bad intent, or how approximately $5000 was a substantial loss or equivalent to financial ruin. *Cf. Beilowitz*, 233 F. Supp. 2d at 643-44 (finding a substantial loss where plaintiff lost $11 million in sales, or approximately 40% of plaintiff's sales).

---

[10] For example, though the Court agrees with the basic premise that a zero-dollar meal to a veteran makes no money itself, perhaps the promotion encouraged more non-veteran customers, paying full price, to visit on Veterans Day with veteran family members, thus increasing the overall sales on that given day. Perhaps not. But "[r]ooting around for an answer to these mysteries is not [the Court's] role . . . ." *Morton*, 993 F.3d at 205 n.10.

Similarly, the Scism Parties do not provide the Court with figures or an explanation as to how Golden Corral "auto-shipp[ing] unsolicited food and inventory[,] . . . much of which was near expiration, and requir[ing]" payment was arbitrary, done in bad faith, or caused economic ruin. Even if receiving unwanted food and inventory was not ideal, "not all improper conduct of franchisors" violates the NJFPA. *South Gas*, 2016 WL 816748, at *7. Without more, the Court cannot find that shipping the food and requesting payment was unreasonable.

Accordingly, because the Scism Parties fail to establish a genuine dispute of material fact that Golden Corral imposed unreasonable standards of performance, the Court will dismiss the Scism Parties' NJFPA claim (Count Ten).[11]

### C. The Scism Parties Breached the Franchise Agreement and Golden Corral is Entitled to Consequential Damages

Golden Corral alleges that the Scism Parties breached the Agreement by ceasing Restaurant operations prior to the franchise term's expiration and seeks consequential damages pursuant to the Agreement. GCC ¶ 25. The Scism Parties argue they did not breach the Agreement and Golden Corral is not entitled to the damages it seeks. The Court agrees with Golden Corral.

*1. The Scism Parties breached the Agreement by ceasing operations*

Golden Corral alleges that the Scism Parties breached the Agreement by ceasing operations prior to the franchise's fifteen-year term. The Scism Parties do not dispute (1) that the initial term of the franchise was fifteen years (expiring October 31, 2026), (2) they ceased operating the Restaurant on or about May 22, 2018, (3) their actions constituted default of the Agreement, and (4) they did not pay Golden Corral further royalty or marketing fees after the Agreement was

---

[11] Golden Corral argues, in the alternative. that if the Court finds it violated the NJFPA, the Scism Parties' claim fails for lack of damages. *See* Golden Corral Mot. at 25-27. Because the Court finds Golden Corral did not violate the NJFPA, it will not address this argument.

terminated.  *See* Golden Corral SOF ¶¶ 6, 8, 9, 10, 11-12, 14-16; Scism Resp. to SOF ¶¶ 6, 8, 9, 10, 11-12, 14-16.

Instead, the Scism Parties argue they did not breach the Agreement because (1) the Agreement contemplates abandonment as an act of default and provides that the Agreement may be terminated if the franchisee "ceases to operate or otherwise abandons the franchised business" and (2) Golden Corral, not the Scism Parties, terminated the Agreement.  Scism Opp'n at 7.[12] Essentially, the Scism Parties argue that when a contract contemplates an act of default, the defaulting party cannot be held liable for that act once the non-defaulting party exercises its right to terminate the agreement.

Golden Corral responds that the Scism Parties' argument "is divorced from basic contract principles[] . . . [and] would render contracts meaningless."  Golden Corral Reply at 4.  The Court agrees with Golden Corral.

"It is hornbook law that when one party to a contract commits a material breach, the non-breacher has the option of either continuing the contract and suing for partial breach, or terminating the agreement in its entirety."  *General Motors Corp. v. New A.C. Chevrolet*, 263 F.3d 296, 316 n.5 (3d Cir. 2001) (citing 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.16, at 495 (2d ed.1998)).  "[A] breach is material if it 'will deprive the injured party of the benefit that is justifiably expected' under the contract."  *Id.* at 315 (quoting 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.16, at 497 (2d ed.1998)).

---

[12] The Scism Parties also argue for the first time in their Reply that Golden Corral cannot recover for its breach of contract claim because Golden Corral has "unclean hands."  Scism Reply at 5. The Court will not consider this argument because "[a] party's argument is waived if it is raised for the first time in a reply brief."  *United States v. Heilman*, 377 Fed. App'x 157, 198 (3d Cir. 2010).

This a straightforward breach of contract: the Agreement explicitly provides for a fifteen-year franchise term, and thus Golden Corral could justifiably expect the benefits of that term.  *See id.* at 316 (the parties' justifiable expectations are best evidenced by the agreement's provisions).  The Scism Parties defaulted under the Agreement by ceasing operations prior to the fifteen-year term expiring, which deprived Golden Corral of the benefit of a fifteen-year franchise operation.  Then Golden Corral, pursuant to the Agreement, terminated the Agreement and sought damages.  *See* Agreement Section XIV.B.I (emphasis added) ("Franchisee **shall be deemed to be in default** and Franchisor may, at its option, terminate this Agreement . . . [**if Franchisee] ceases to operate or otherwise abandon the franchised business** . . . ."); Agreement Section XV (emphasis added) ("OBLIGATIONS UPON TERMINATION . . . **In the event of termination for any default of Franchisee**, [**Franchisee shall promptly pay**] all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor **as a result of the default** . . . .").  According to the Scism Parties' argument, any non-breaching party who exercises their right to terminate a contract, rather than to sue for partial breach, forfeits recovery.  This is unpersuasive.

Accordingly, the Court finds that the Scism Parties breached the Agreement by ceasing operations prior to the Agreement expiring.

### 2.   *Golden Corral is entitled to consequential damages*

Golden Corral alleges that the Scism Parties have failed to pay consequential damages pursuant to the Agreement's "Obligations Upon Termination" provision, Section XV.I, which provides that "in the event of termination by default by the Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by GC Franchising as a result of the default[] . . . ."  GCC ¶ 21.  Golden Corral seeks damages in the form of the lost future profits it would have received.  *See id.* ¶ 18(a)-(b).  Golden Corral claims it is entitled to

these payments because the Agreement requires the Scism Parties to pay a 4% royalty fee (Section IV.A.2) and 2.4%[13] marketing fee (Section IV.B), which both come out of the Restaurant's gross sales.  *See* Golden Corral Compl ¶ 18(a)-(b); Golden Corral SOF ¶¶ 15-16; Scism Resp. to SOF ¶¶ 15-16.

The Scism Parties raise multiple arguments as to why the Agreement does not provide for these damages or, alternatively, why the damages amount to $0.00.  *See* Scism Opp'n at 8-12.  But as Golden Corral notes, the Court[14] already rejected many of these arguments when denying the Scism Parties' motion for judgment on the pleadings.  Golden Corral Reply at 4 (citing D.E. 84 ("Salas Op.")).  The Scism Parties argue the Court is not bound by that decision because "[i]t is not a final entry of judgment of this court[]" and therefore "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Scism Reply at 3 (quoting Fed. R. Civ. P. 54(b)).

The Scism Parties misconstrue Rule 54(b).  Rule 54(b) is a mechanism through which a district court can certify "[a]n order that does not dispose of all claims"—which would otherwise "not [be] an immediately appealable final order"—as final.  *McGillvary v. Galfy*, 2023 WL 7319450, at *1 (3d Cir. Oct. 12, 2023).  It is inapplicable here where no party seeks certification of a non-appealable order.

Rather, the applicable doctrine is the "law of the case doctrine, which is "triggered when one court is faced with a ruling on the merits by a different and co-equal court on an identical issue."  *Lombardi v. Masso*, 207 N.J. 517, 539 (2011).  The doctrine "militates against courts re-

---

[13] The marketing fee varied but was 2.4% when the Scism Parties ceased Restaurant operations.
[14] Judge Salas.

deciding issues of law that were earlier resolved in the same case, either expressly or by necessary implication." *Frank Briscoe Co. v. Travelers Indem. Co.*, 65 F. Supp. 2d 285, 293 (D.N.J. 1999).

Here, Judge Salas addressed many, but not all, of the Scism Parties' arguments. *See Salas Op.* at 3-8. Judge Salas analyzed each argument thoroughly and properly left issues of contract interpretation and other legal conclusions for summary judgment. *See generally* Salas Op. at 3-8. The Court incorporates the Salas Opinion correspondingly.

> *(a) The initial franchise fee is distinct from the Scism Parties' continuing obligations under the Agreement*

First, the Scism Parties argue that the initial franchise fee was paid in consideration for lost future royalties, and therefore lost future royalties are not recoverable. Scism Opp'n/Reply at 8. In support, the Scism Parties cite Section IV.A.1 of the Agreement, which provides:

> **The initial franchise fee** (and each portion thereof) described in this Section IV.A.1. **shall be** deemed fully earned and non-refundable **in consideration for**, among other things, the administrative and other expenses incurred by Franchisor in furnishing assistance and services to Franchisee and **for Franchisor's lost future royalties** or deferred opportunity to franchise others.

Scism Opp'n at 8 (emphasis added). Judge Salas found that the Scism Parties' interpretation would also mean that "even if *they* terminated the . . . Agreement, Golden Corral would not be entitled to lost future royalties[,] which "was in tension with the provision" requiring the Scism Parties to operate the Restaurant for a fifteen-year period. Salas Op. at 6 (emphasis in original). Though Judge Salas declined to interpret the Agreement, she noted that basic principles of contract interpretation require the Court to read the Agreement holistically so that other provisions of the Agreement are not rendered "toothless." *Id.* (citing *Hardey ex rel. Dowdell v. Abdul-Matin*, 965 A.2d 1165, 1169-70 (N.J. 2009)).

22

The Court agrees with Golden Corral that the Scism Parties' interpretation of the Agreement is not reasonable when reading the Agreement holistically. *See* Golden Corral Reply at 5; *Hardy*, 965 at 1169-70 (courts must interpret contracts "in a fair and common sense manner" such that terms are not rendered "meaningless"). The Scism Parties' interpretation would require the Court to read at least two of the Agreement's provision as superfluous and/or meaningless. First, as Judge Salas discussed, if the Court applied the Scism Parties' interpretation, the Agreement's fifteen-year term is rendered meaningless, as Golden Corral would be prohibited from recovering lost future profits in all scenarios.

Second, if the Court applied the Scism Parties' interpretation, then Section IV.A.2, which delineates the Scism Parties' **continuing obligation** to pay royalty fees throughout the fifteen-year term, would be superfluous. But when reading the provisions holistically, it is clear that Section IV.A.1 delineates the Scism Parties' **initial obligation** to pay Golden Corral a "fully earned and non-refundable [initial franchise] fee," which Golden Corral would retain regardless of what happened thereafter. In contrast, Section IV.A.2, as noted, delineates the Scism Parties' **continuing obligation**, which would have been paid monthly but for the Scism Parties' breach. And the Court must turn to the parties' continuing obligations when analyzing consequential damages, as those obligations are impacted by the non-continuance of the Restaurant.[15]

Thus, the Court declines to apply the Scism Parties' interpretation, as it would render the provisions establishing the fifteen-year franchise term and the continuing obligation to pay a royalty fee meaningless and superfluous. *See Hardy*, 965 at 1169-70 (courts must interpret contracts "in a fair and common sense manner" such that terms are not rendered "meaningless");

---

[15] Similarly, the Agreement's provision establishing the Scism Parties' monthly obligation to pay "marketing fees" and contribute to Golden Corral's marketing funds is a continuing obligation. *See* Agreement Section IV.B.

*Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980) ("The strongest external sign of agreement between contracting parties is the words they use in their written contract[,]" and "a court will make no inference or give any construction to the terms of a written contract that may be in conflict with the clearly express language of the written agreement."); *Penske Logistics, Inc. v. KLLM, Inc.*, 285 F. Supp. 468, 474 (D.N.J. 2003) ("Under the principles of contract interpretation, a contract should not be given an interpretation which renders a term or terms superfluous or meaningless."); *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999) (courts can interpret contracts "as a matter of law" if the provisions "can be interpreted only one way").

    *(b)  "All damages" includes consequential damages*

Next, the Scism Parties argue that because royalty and marketing fees are not specifically stated in Section XV.H, which provides that Golden Corral can recover "all damages" in the event of termination by default, Golden Corral cannot recover these specific damages.  Scism Opp'n at 11.  Judge Salas rejected this argument as contrary to contract law, finding that the Agreement "does not clearly exclude lost future royalty payments simply because it does not *expressly include* that precise language."  Salas Op. at 5 (emphasis in original) (citing *Trans. Ins. Co. v. Am. Harvest Baking Co.*, 2018 WL 2215514, at *4 (D.N.J. May 15, 2018) ("Any limitations of a party's remedies for the other party's breach must be specifically agreed upon.")).  The Scism Parties do not provide, nor does the Court find, a reason to alter this ruling.

    *(c)  The Scism Parties' breach proximately caused the Restaurant's lost future profits*

The Scism Parties then argue that Golden Corral cannot recover consequential damages because Golden Corral is the proximate cause for the Agreement's termination.  Scism Opp'n at 14-15.  In support, the Scism Parties primarily rely on two cases, both which Judge Salas found, and this Court also finds, inapplicable to the facts here.  *Id.* at 14-15 (first citing *Mister Softee, Inc.*

*v. Amanhollahi*, 2016 WL 5745105 (D.N.J. Sept. 30, 2016); then citing *Dunkin' Donuts, Inc. v. Arkay Donuts, LLC*, 2006 WL 2417241 (D.N.J. Aug. 21, 2006)).[16]

These cases are distinguishable. In the cited cases, courts denied lost future profits where the franchisor terminated a franchise agreement after the franchisee stopped making payments to the franchisor, finding that the franchisor's termination—and not the franchisee's breach—proximately caused any lost future profits. *See Mister Softee*, 2016 WL 5745105, at *5, 12-13; *Dunkin' Donuts*, 2006 WL 2417241, at *5. Notably, in neither case did the franchisees cease operating the restaurant. Thus, the Scism Parties' cited authority "has little bearing on cases, as here, where it is the franchisee's own decision to cease operating that allegedly deprives a franchisor of future profits." *Coraud LLC v. Kidville Franchise Co., LLC*, 121 F. Supp. 2d 387, 399 (S.D.N.Y. 2015). In simple terms, here, the Restaurant ceased earning profits once the Scism Parties closed its doors, regardless of Golden Corral later terminating the Agreement. *See id.* ("[C]ourts have generally permitted a franchisor to recover future royalties when the franchisee abandons the franchise.").[17]

---

[16] The Scism Parties also cite *Red Roof Franchising, LLC v. Patel*, 877 F. Supp. 2d 124, 132 (D.N.J. 2012), for the proposition that "under settled franchise law, under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefit." Scism Opp'n at 16. In *Red Roof*, the franchisees argued the franchisor breached the franchise agreement, but then "continued to operate the franchise . . . [and] receive the advantages of operating as a franchisee under the contract." 877 F. Supp. 2d at 134. Like Judge Salas previously noted, this case "is inapposite[]" because here "Golden Corral did not seek to take advantage of the contract's benefits in a similarly impermissible way." Salas Op. at 8-9 n.4.

[17] Relatedly, the Scism Parties argue that the Restaurant's unsuitable location, and not the Scism Parties' abandonment, proximately caused any lost future profits because the Restaurant would not have been successful in that location. Scism Reply at 7. The Scism Parties raise this argument for the first time in reply, and thus the Court will not consider it. But even if the Court did address it, this argument does not go toward proximate cause; rather, it goes towards the Restaurant's hypothetical future profits—an exercise of conjecture given that the Scism Parties ceased operating the Restaurant.

*(d) Golden Corral's damages are calculated based on what the Restaurant would have earned but for the Scism Parties' breach*

Next, the Scism Parties argue that even if Golden Corral is entitled to these damages, that the royalties for the remaining 101 months in the Agreement is $0.00. Scism Opp'n at 13. The Scism Parties reach this calculation because when the Restaurant ceased operating, it also stopped making any sales, and thus any percentage taken from $0.00 of gross sales would equal zero. *See id.* Judge Salas "reject[ed] this argument[]" as contrary to contract law, finding the Scism Parties "conflate" breach and damages because "Golden Corral is seeking a portion of lost profits that [the Scism Parties] *would have* earned had they not . . . abandon[ed] the restaurant." Salas Op. at 5 (emphasis added). The Scism Parties do not provide, nor does the Court find, a reason to alter this ruling.

*(e) The Agreement does not limit Golden Corral's recovery to injunctive relief*

Lastly, the Scism Parties argue that even if the Agreement contemplates these damages, Golden Corral cannot recover because the Agreement only allows for damages in connection with "**obtaining injunctive or other relief**[,]" and Golden Corral is not seeking injunctive relief. Scism Opp'n at 12 (emphasis in original). As Golden Corral notes, this language expressly includes "or other relief." Golden Corral Reply at 7 n.1. Thus, the plain language of the Agreement does not limit Golden Corral's recovery to only injunctive relief.

Accordingly, the Court finds that Golden Corral, pursuant to the Agreement and the Scism Parties' abandonment of the Restaurant, may seek consequential damages related to lost future profits.

*3. Golden Corral has proven their damages to a reasonable degree of certainty*

As discussed above, the Agreement established a fifteen-year term for the Restaurant's operation. Pursuant to the Agreement, the Scism Parties had continuous obligations to (1) pay a

26

monthly royalty fee (Section IV.A.2) and (2) contribute monthly to Golden Corral's marketing funds (Section IV.B).   As stated in these provisions, the "fees" were percentages of the Restaurants' monthly gross sales.  Thus, the Scism Parties' act of default—ceasing to operate the Restaurant prior to the fifteen-year term expiration—proximately caused the Restaurant to lose future sales for the remainder of the fifteen-year term.   Pursuant to Section XV.H of the Agreement, Golden Corral is entitled to consequential damages resulting from the Scism Parties' default.  Golden Corral seeks to recover the loss of the Scism Parties' future payments of the royalty and marketing fees.

"[O]nce a [claimant] has established an injury, it need prove the amount of damages only to a reasonable degree of certainty." *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 219 F. Supp. 600, 605 (D.N.J. 2002) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4. F.3d 1153, 1176 (3d Cir. 1993)).  Where "absolute precision in fixing damages" is unattainable, courts should seek essential justice and fairness. *See id.* (citing cases).

Golden Corral seeks $1,168,368 in lost future royalty and marketing fees.  GCC ¶ 20; *see also id.* Ex. C ("Notice of Default Letter").  To calculate this number, Golden Corral used "the Restaurant's rolling (prior) 12 month sales of $2,169,000" to estimate the Restaurant's future average monthly profit, and then Golden Corral applied the 4% and 2.4% royalty and marketing fees, which is what the Scism Parties would have owed Golden Corral. *See* GCC ¶ 20; Notice of Default Letter at 2.  This totaled $11,568/month. *See* GCC ¶ 20; Notice of Default Letter at 2. Golden Corral then multiplied $11,568 by 101, the number of months remaining in the Agreement, which equals $1,168,368. *See* GC Compl. ¶ 20; Notice of Default Letter at 2.

The Scism Parties do not dispute these figures or calculations. *See* Scism Opp'n at 13. Instead, the Scism Parties argue that this calculation "fail[s] to reflect the documented downward

sales trend[,]" is "completely speculative," and is "not permitted by any language" in the Agreement. *Id.* But the Scism Parties fail to acknowledge that any "downward sales trend" that *might* have happened *had* they continued operating the restaurant is also speculative. The Scism Parties also do not explain why it is unreasonable for Golden Corral to use the Restaurant's recent year of sales to estimate the Restaurant's hypothetical future profits. Rather, the Scism Parties only repeat the rejected argument that "4% and 2.4% of $0.00 actual gross sales for the 101 months 'remaining'" in the Agreement "equals $0.00." *Id.* The Court finds that Golden Corral calculated its consequential damages to a reasonable degree of certainty by using the most recent data to calculate future, unknowable data. *See Lithuanian Commerce*, 219 F. Supp. at 605 (courts should apply principles of fairness when "absolute precision" is not available). Indeed, Golden Corral can only estimate as to the Restaurant's future gross profits because it closed, and prior sales are arguably the most reasonable way of calculating damages.

Finally, the Scism Parties argue that Golden Corral "made no efforts to mitigate its purported damages." *Id.* at 17. In support, the Scism Parties cite that a Golden Corral representative, when asked if Golden Corral took "any steps to reduce the amount of damages[,]" answered "I have no awareness of that." *Id.* n.13 (quoting 129-2 Ex. J, 155:18-20).

Golden Corral argues that it took "considerable efforts" to have another franchisee ("Mr. Patel") assume the Restaurant and "sought to facilitate the sale of [the Restaurant's] equipment . . . ." Golden Corral Reply at 10 (citing Golden Corral Resp. to SOF ¶ 57 (first citing D.E. 133-1 Ex. A (" Supp. Scism Dep."), 201:22-25 (Mr. Scism acknowledging Golden Corral spoke with Mr. Patel to potentially assume the restaurant); then citing D.E. 133-1 Ex. A (e-mail chain with Mr. Scism discussing efforts to sell the equipment)). In response, the Scism Parties claim that (1) Golden Corral, after connecting Mr. Scism with Mr. Patel, did not do enough to facilitate the

28

franchise takeover; and (2) Golden Corral did not liquidate the Restaurant's furnishings, equipment, and fixtures.  Scism Reply at 9-10.  The Court agrees with Golden Corral.

The Scism Parties cite no evidence in opposition to Golden Corral's evidence, nor do they explain why Golden Corral's efforts, albeit unsuccessful, were unreasonable.  *See O'Brien v. Biobanc USA*, 2011 WL 2532465, at *7 (D.N.J. June 23, 2011) (citations omitted) ("[T]he burden of proving facts in mitigation of damages rest[s] upon the party breaching the contract.").

Accordingly, the Court will award Golden Corral $1,168,368 in consequential damages.

## IV.    CONCLUSION

For the reasons stated above, the Court will **GRANT** Golden Corral's motion, D.E. 129-1, **DISMISS** the Scism Parties' Third-Party Complaint, D.E. 20, **with prejudice**, and **ENTER JUDGMENT** on Golden Corral's counterclaim against the Scism Parties in the amount of $1,168,368.  The Court will **DENY** the Scism Parties' Cross Motion, D.E. 130-3.  An appropriate Order accompanies this Opinion.


Dated: March 27, 2024

Evelyn Padin, U.S.D.J.

29